**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **NICOLE CIACCIO,**<br><br>*Plaintiff*<br><br>v.<br><br>**UPPER SAUCON TOWNSHIP, et al.,**<br><br>*Defendants* | **Case No. 5:23-cv-02863-JDW** |

## MEMORANDUM

In resolving a summary judgment motion, a judge has to determine whether the facts are so clear-cut that there's nothing left for a jury to decide. When an officer on the scene of a police action describes his colleague's conduct as "iffy,"[1] it's a safe bet that there are, in fact, factual disputes left to resolve. That's the situation in this case. Nicole Ciaccio has enough evidence to lead a reasonable jury to conclude that certain officers from the Borough of Coopersburg and Upper Saucon Township acted unreasonably when they entered her home without a warrant and then seized her and her gun during a wellness check. Thus, I will not grant summary judgment on Ms. Ciaccio's Second and Fourth Amendment claims against those officers. However, I will grant summary judgment

---

[1]    (ECF No. 50-15 at 01:19:30.)

in favor of one officer and both the Borough and the Township because Ms. Ciaccio has no basis to impose liability on them.

I.    **BACKGROUND**

A.    **Factual History**

On the morning of February 8, 2023, Nicole Ciaccio texted a friend, Scott Shead: "I just shot myself," and directed Mr. Shead to find her dad. Mr. Shead called Ms. Ciaccio, but she did not answer him. Concerned, Mr. Shead called 911. He told the operator that Ms. Ciaccio did not have a history of suicide attempts but that she did have an anxiety issue. He reported that Ms. Ciaccio lived alone and owned a handgun. The Lehigh County Communications Center sent multiple officers to Ms. Ciaccio's home in Coopersburg, Pennsylvania, including Officer Thomas Della Sala, Officer Christopher Litz, Detective Brian McLaughlin, and Lieutenant Michael Fritts from the Upper Saucon Township Police Department. Officer William Carvounis from the Borough of Coopersburg Police Department also arrived to provide backup assistance.

Officer Della Sala was one of the first officers to arrive at Ms. Ciaccio's home. Upon arrival, he spoke with her neighbor, who reported that he had not heard any gunshots. Officer Della Sala knocked on Ms. Ciaccio's front door multiple times, but no one answered. He stood on one side of Ms. Ciaccio's front door, and Officer Carvounis stood on the other side. While on his way to the scene, Lt. Fritts instructed other officers to form a perimeter around Ms. Ciaccio's home while they gathered information.

A few minutes after police arrived at her home, Ms. Ciaccio called the Bucks County Communications Center and advised that she was not at home, was at work, and asked that the police stop banging on her door. A few minutes later, Ms. Ciaccio started speaking with Officers Carvounis and Della Sala through her Ring doorbell camera. She told them that she would not come to the door and wanted the police to leave. She also spoke with the Lehigh County Communications Center and said that she was upset about the police presence outside her home and wanted them to leave. After that call, the dispatcher notified officers on the scene that there could be someone else in the house with Ms. Ciaccio because the dispatcher heard Ms. Ciaccio speaking to someone.

Ms. Ciaccio started speaking with Officers Carvounis and Della Sala again over her Ring camera. Both officers requested that she come outside and talk with them so they could make sure she was okay. Ms. Ciaccio refused and told officers that she was "fine" and that they needed a warrant. (ECF No. 47 at ¶ 146.) Following that conversation, Officer Carvounis remarked that "[s]he didn't sound shot," and Officer Della Sala replied: "no." (*Id.*) Ms. Ciaccio continued speaking with the officers and directed them to leave her property. She explained that she had to work and wanted them to leave her alone. The officers told her that they were there because someone called 911 thinking she might be in danger and that they needed to verify that she was okay. Ms. Ciaccio replied: "I'm talking to you right now." (*Id.* at ¶ 147.) Ms. Ciaccio told the officers that she had difficulty getting down the stairs due to a prior injury, and she continued to refuse to come to the front door.

When Ms. Ciaccio asked the officers if they had a warrant, Officer Carvounis replied: "It's not a warrant, it's not a criminal matter. We're doing a well-being check to make sure you're not hurt or injured." (ECF No. 47 at ¶ 147.) He made a similar statement a few minutes later, explaining: "It's a well-being check. There's no criminal matter here. You're not in any trouble." (*Id.*) During this exchange over the Ring camera, one of the officers asked Ms. Ciaccio if she was bleeding or had hurt herself, to which she responded: "No." (*Id.*) One of them replied: "Okay, that's good. Alright, that's a plus, that changes everything, that's good." (*Id.*) Ms. Ciaccio continued to refuse to come to the front door if the officers did not have a warrant. Lt. Fritts advised Ms. Ciaccio that the officers could not leave until she came down and talked to them in person.

During a lull in the conversation, Officer Carvounis asked if he should try to find a key to get into Ms. Ciaccio's house. At that point, Lt. Fritts advised him: "We don't have any right to enter the home. We have a confirmed neighbor who didn't hear a gunshot. We have no exigent circumstance. And we've made contact with her." (ECF No. 50-15 at 29:30.)

Thereafter, Lt. Fritts instructed officers to reposition. Officer Della Sala moved across the street. Officer Carvounis remained off to the side of Ms. Ciaccio's front door. While he was there, he placed a sticker over her Ring camera, prompting Ms. Ciaccio to ask if someone was obstructing her camera. No one responded. About seventeen minutes after Officer Carvounis put the sticker on, Ms. Ciaccio opened the door just wide enough to stick out her hand "in an attempt to remove the sticker from the Ring doorbell camera." (ECF No. 47 at ¶

50.) At that point, Officer Carvounis ran up to her home, pushed Ms. Ciaccio's door open, stepped into her home, grabbed her, held onto her arms, and brought her outside.

Officers Della Sala and Litz ran to assist Officer Carvounis in restraining Ms. Ciaccio. Officer Litz placed her in handcuffs. Det. McLaughlin arrived and told Ms. Ciaccio that they were restraining her as a precaution, but that they had spoken with her dad, who said that there had been a "misunderstanding." (ECF No. 50-18. at 48:30.) He also asked if there was anyone else inside the house, to which Ms. Ciaccio responded: "Nope, you can go and look." (*Id.* at 48:45.) Officer Litz asked whether they could go inside her home to look, and Ms. Ciaccio replied: "You can do whatever you want." (*Id.*) Then, Detective McLaughlin and Officer Litz did a protective sweep of Ms. Ciaccio's home, which involved looking in all the rooms to make sure no one was inside. While they were sweeping the home, Officer Carvounis brought Ms. Ciaccio into the entryway of her home, where she sat on the bottom of the stairs. She also advised Officer Carvounis that she owned a gun and that it was in her bedroom.

Once Ms. Ciaccio was inside her house, Lt. Fritts arrived and started speaking to her. While standing next to Ms. Ciaccio, Lt. Fritts sent a message over his radio that he was "awaiting crisis." (*Id.* at 51:15.) Upon hearing this, Ms. Ciaccio told him: "I'm not in crisis!" (*Id.*) By this point in time, it was clear that Ms. Ciaccio was not injured or in immediate need of medical attention. Indeed, she was not bleeding and did not have any visible injuries. In fact, she asked Lt. Fritts if she looked injured, and he responded: "No you don't." (*Id.* at 53:00.) Ms. Ciaccio wanted the encounter to end, asking officers: "May I go now?" (*Id.* at 54:02.) But

the officers did not end the encounter. Instead, Lt. Fritts advised Ms. Ciaccio that because of the text message she had sent to Mr. Shead about shooting herself, a crisis worker was going to come talk to her. Officer Carvounis left before the crisis worker arrived. Det. McLaughlin remained inside Ms. Ciaccio's home with her while they waited for the crisis worker.

As the crisis worker arrived, Officer Della Sala asked Lt. Fritts if someone was going to petition for a 302, meaning an involuntary commitment. Lt. Fritts told him no, and then he advised Officers Della Sala and Litz that he had learned that there had been a misunderstanding. He told them that he had spoken with Mr. Shead, who said that he believed there was a typo in Ms. Ciaccio's text message, and that she meant to say she "shit" herself, rather than "shot" herself. Lt. Fritts shared this information with Alicia Mendoza-Perez, the crisis worker, when she arrived. Ms. Mendoza-Perez went inside to speak with Ms. Ciaccio. During this time, Det. McLaughlin remained inside with Ms. Ciaccio.

While Ms. Mendoza-Perez and Det. McLaughlin were speaking with Ms. Ciaccio, Officers Della Sala and Litz were outside speaking with Lt. Fritts. Lt. Fritts remarked that he could see that Ms. Ciaccio was not shot and that "this is how guys get themselves jammed up" with a "Fourth Amendment violation" because "she already said she's fine." (ECF No. 50-15 at 01:19:14.) Officer Della Sala opined that Officer Carvounis's act of grabbing Ms. Ciaccio and trying to get her to come outside was "iffy." (*Id.* at 01:19:30.) All the while, Ms. Mendoza-Perez and Det. McLaughlin were still inside speaking with Ms. Ciaccio. The situation appeared to be winding down by this point, and the officers expected that they would be leaving soon.

However, the situation changed at some unknown point when Ms. Mendoza-Perez claimed that she spoke with Ms. Ciaccio's father, Harry Ciaccio, who expressed concern for Ms. Ciaccio's wellbeing. Ms. Mendoza-Perez believed that if Ms. Ciaccio did not agree to go the hospital for a mental health evaluation, then Mr. Ciaccio was willing to act as a petitioner for a 302 warrant. Mr. Ciaccio denies that he ever spoke with Ms. Mendoza-Perez and denies that he agreed to be a 302 petitioner. In any event, Ms. Mendoza-Perez, Lt. Fritts, and Det. McLaughlin did not leave Ms. Ciaccio's home.

At some point, they relocated from the entryway of the house and made their way to her kitchen and living room area. During this time, the parties were talking with Ms. Ciaccio about going to the hospital for a mental health evaluation and told her that her father wanted her to go. Ms. Ciaccio became upset at various points during this discussion and made clear that she did not want to go to the hospital, but all three individuals continued to try to persuade Ms. Ciaccio to agree to go without a warrant. For example, Ms. Mendoza-Perez advised Ms. Ciaccio that if she was taken to the hospital via a 302 petition, then the authorities would take her gun away. Ultimately, Ms. Ciaccio got into Det. McLaughlin's car without incident, and he drove her to the hospital for a mental health evaluation. He arranged for Ms. Ciaccio's father to meet her there. No one initiated a 302 petition against Ms. Ciaccio, and the hospital discharged her hours later.

Before leaving Ms. Ciaccio's home, Det. McLaughlin confiscated her gun and told her that he was holding onto it for "safekeeping." (ECF No. 50-17, Part 2 at 12:00.) Det.

McLaughlin kept Ms. Ciaccio's gun, and the police stored it at the Upper Saucon Township Police Department. On February 11, 2023, Ms. Ciaccio reached out to the Police Department to get her gun back, and the police returned it to her on February 17, 2023.

### B.    Procedural History

On July 27, 2023, Ms. Ciaccio filed her initial Complaint, asserting claims for constitutional violations pursuant to 42 U.S.C. 1983 and state law claims. In her operative Second Amended Complaint, Ms. Ciaccio brings claims against Chief Nicoletti, Lt. Fritts, Det. McLaughlin, Officer Carvounis, Officer Della Sala, and Officer Litz[2] for various Fourth Amendment violations and state law claims for assault, battery, false arrest and imprisonment, and intentional infliction of emotional distress ("IIED"). She also alleges a separate Second Amendment claim against Det. McLaughlin and asserts municipal liability claims against Upper Saucon Township (the "Township") and the Borough of Coopersburg (the "Borough") pursuant to *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978). Defendants moved for summary judgment on most of Ms. Ciaccio's claims,[3] and their motion is ripe for disposition.

---

[2]    During oral argument, Ms. Ciaccio's Counsel dropped the claims against Officer Litz, saying that the claims against him were "off the table." (Tr. at 30:9.) All citations to "Tr." refer to the transcript from the oral argument on February 12, 2025.

[3]    As discussed during oral argument, Defendants did not make any argument as to Ms. Ciaccio's claims against Chief Nicoletti based on a theory of supervisory liability. Thus, I have not considered those claims in ruling on Defendants' motion for summary judgment, and they will proceed to trial.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) permits a party to seek, and a court to enter, summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In ruling on a summary judgment motion, a court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (quotation omitted). However, where (as here) there is video footage related to the claims, the Court must not draw inferences that "blatantly" contradict the video evidence. *Id.* at 380.

In opposing summary judgment, "[t]he non-moving party may not merely deny the allegations in the moving party's pleadings" and "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* (quotation omitted). "[I]nstead, [s]he must show where in the record there exists a genuine dispute over a material fact." *Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007) (citation omitted); *see also* Fed. R. Civ. P. 56(c)(1)(A)-(B). If she fails to make this showing, then the Court may "consider the fact undisputed for purposes of the motion" and/or "grant summary judgment if the motion and supporting materials — including the facts considered undisputed — show that the movant is entitled to it[.]" Fed. R. Civ. P. 56(e)(2), (3).

III.     **ANALYSIS**

A.     **Fourth Amendment Claims**

1.     **Merits**

a.     **Forming a perimeter around Ms. Ciaccio's home**

Ms. Ciaccio's first unlawful seizure claim fails because the evidence in the record does not establish that any officer seized her before she opened the door of her home. "A seizure can occur in two ways: 1) 'a laying on of hands or application of physical force to restrain movement, even when it is ultimately unsuccessful,' or 2) 'submission to a show of authority.'" *United States v. Amos*, 88 F.4th 446, 451 (3d Cir. 2023) (quotation omitted). There is no dispute that none of the police officers touched Ms. Ciaccio before Officer Carvounis grabbed her as she opened her front door. Thus, prior to that event, a seizure could only have occurred if Ms. Ciaccio: i) submitted ii) to a show of authority. "The absence of either element is fatal" to her claim. *Id.*

To determine whether there has been a show of authority, I "must ask whether a reasonable person would have believed [s]he was not free to leave based on the officer's words and actions." *Id.* at 452 (citation omitted). Multiple armed officers formed a perimeter around Ms. Ciaccio's home, including Officers Carvounis and Della Sala, who stood guard at her front door. During oral argument, Counsel for both Defendants conceded that Ms. Ciaccio was not free to leave at that point.

However, Ms. Ciaccio's claim fails because she has not come forward with any evidence showing that she submitted to this show of authority. In fact, the evidence shows the opposite—Ms. Ciaccio remained in her home and refused to come out until Officer Carvounis forcibly removed her. In other words, although Ms. Ciaccio was not free to leave her home at the time, there is no evidence that she attempted to leave; nor is there any evidence that she wanted to leave but could not. As a rule, "there is no seizure without actual submission; otherwise, there is at most an attempted seizure, so far as the Fourth Amendment is concerned." *Amos*, 88 F.4th at 453 (quotation omitted). Thus, Ms. Ciaccio cannot prevail on this aspect of her Fourth Amendment claim.

### b.    Removing Ms. Ciaccio from her home

Officer Carvounis seized Ms. Ciaccio when he grabbed her in her entryway and restrained her movement by holding onto her. But the Fourth Amendment prohibits "unreasonable" searches and seizures, so Ms. Ciaccio's claim depends on the whether Officer Carvounis's conduct was reasonable. "It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586 (1980) (quotation omitted). Thus, the question is whether there was some exception to the warrant requirement, such as exigent circumstances.[4]

---

[4]    There is some question as to whether officers must demonstrate "probable cause *plus* exigent circumstances in order to make a lawful entry into a home" without a warrant. *Kirk v. Louisiana*, 536 U.S. 635, 638 (2002) (emphasis added). However, because I conclude

### i.    No exigency based on emergency aid

"Before agents of the government may invade the sanctity of the home, the burden is on the government to demonstrate exigent circumstances that overcome the presumption of unreasonableness that attaches to all warrantless home entries." *Welsh v. Wisconsin*, 466 U.S. 740, 750 (1984). To determine whether exigent circumstances existed, courts "review[] the facts and reasonably discoverable information available to the officers at the time they took their actions and ... consider[] the totality of the circumstances facing them." *Est. of Smith v. Marasco*, 318 F.3d 497, 518 (3d Cir. 2003). Certainly, "law enforcement officers 'may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury.'" *Michigan v. Fisher*, 558 U.S. 45, 47 (2009) (quotation omitted). This "emergency aid exception" requires "'an objectively reasonable basis for believing,' that 'a person within [the house] is in need of immediate aid[.]'" *Id.* (same). Officer Carvounis has not demonstrated that he had a reasonable basis to believe that Ms. Ciaccio or someone else in her home was injured or in imminent danger.

*First*, the call that prompted officers to go to Ms. Ciaccio's home was that she shot herself—not anyone else. And the radio dispatch conveyed that Ms. Ciaccio lived alone. *Second*, Ms. Ciaccio's neighbor told officers that he did not hear any gunshots, and both

---

that Defendants have not demonstrated that exigent circumstances existed, I need not resolve this question (which neither Party has briefed) at this stage of the proceedings.

Officer Della Sala and Lieutenant Fritts shared that information with Officer Carvounis. *Third*, while talking with Officers Carvounis and Della Sala over the Ring camera, Ms. Ciaccio confirmed that she was not hurt or bleeding. And after speaking with Ms. Ciaccio, Officer Carvounis remarked that "she didn't sound shot," and Officer Della Sala agreed. (ECF No. 50-18 at 04:14.) Officer Della Sala made a similar observation to an EMS worker and also explained that "if [Ms. Ciaccio] was bleeding out, we'd be inside already." (ECF No. 50-15 at 54:20.)

Finally, Lt. Fritts, the commanding officer at the scene, explained to Officer Carvounis that given all this—no gun shots, "no exigent circumstances," and that officers had made contact with Ms. Ciaccio—the police had no right to enter her home. (ECF No. 50-19 at 08:59.) Together, these facts (including Lt. Fritts' summation) could lead a jury to determine that neither Ms. Ciaccio nor anyone inside in her home needed immediate aid. Indeed, Defendants offer little explanation as to how Ms. Ciaccio's minimal opening of her front door turned a non-exigent situation into an emergency to render immediate assistance to someone in her home.[5]

### ii.    No exigency based on police safety

Officer Carvounis also failed to establish exigency due to a concern for police safety. In "limited situations"—such as where there is "danger to the lives of officers or

---

[5]    Given the record before me, I doubt that it was reasonable for Officer Carvounis to think that Ms. Ciaccio "was attempting to escape a captor inside the residence." (ECF No. 49-2 at 17.)

others"—"the need for effective law enforcement trumps the right of privacy and the requirement of a search warrant, thereby excusing an otherwise unconstitutional intrusion." *United States v. Coles*, 437 F.3d 361, 366 (3d Cir. 2006). But Officer Carvounis has not demonstrated that this encounter was one of those situations.

*First*, and foremost, Lehigh Valley Communications dispatched officers to Ms. Ciaccio's home for a wellness check, and Officer Carvounis admitted that when he arrived, he believed that he was there for a well-being check. He told Ms. Ciaccio as much when he tried to persuade her to come to the door. In other words, the officers were not responding to a criminal complaint, and they were not at Ms. Ciaccio's home because they believed she had engaged in criminal activity.

*Second*, when speaking with Officers Carvounis and Della Sala over the Ring camera, Ms. Ciaccio did not threaten them or make any statement that suggested she intended to harm them. Instead, she made clear that she did not want to come to the front door, and she made repeated requests that the officers leave her property if they did not have a warrant. And when she opened her door, she opened it just wide enough so that she could put her hand out to remove the sticker that Officer Carvounis placed on her camera. In other words, based on her limited opening of the door, a reasonable officer would not think that Ms. Ciaccio was opening the door to attack or confront the police in a physical manner. "[W]hen the police knock on a door but the occupants choose not to respond or speak, or maybe even choose to open the door and then close it, or when no

one does anything incriminating, the officers must bear the consequences of the method of investigation they've chosen." *United States v. Ramirez*, 676 F.3d 755, 762 (8th Cir. 2012). That's what happened here.

*Third*, based on the conversations that Ms. Ciaccio had with the officers over the Ring camera—which Officer Carvounis heard—it is not clear that a reasonable officer in Officer Carvounis's position would have a reasonable belief that someone else was in the home with Ms. Ciaccio or that that person intended to harm the officers on the scene. No one else spoke to officers over the Ring camera, and Ms. Ciaccio did not indicate that anyone else was inside with her. Though officers could not know for sure that the person with whom they were communicating was Ms. Ciaccio, that is true of any situation in which officers are speaking with someone through a door, via a Ring camera, or on the phone, and that uncertainty—on its own—does not give rise to a reasonable belief the person inside is a threat to officer safety.

Finally, to the extent Ms. Ciaccio gave conflicting information to officers—*i.e.*, that she was not home (but she was) and that she couldn't come down the stairs for various reasons (but she did)—that conflicting information does not make it reasonable for Officer Carvounis to believe that she opened the door intending to harm him or anyone else. People lie to police all the time, and if a suspicion of lying were sufficient to create a reasonable threat to officer safety, then the exigent circumstances exception would swallow the Fourth Amendment. And, in any event, it is not clear that a reasonable officer

would have credited Ms. Ciaccio's statements where: (1) dispatch confirmed that she was at home, and (2) Officer Della Sala advised that based on his prior experience with Ms. Ciaccio, "she walks around and stuff fine." (ECF No. 50-15 at 13:53.) Given the totality of the circumstances—and construing those circumstances in the light most favorable to Ms. Ciaccio—a jury could determine that no exigency existed, making Officer Carvounis's seizure of her unreasonable. In addition, because a jury could determine that Officer Carvounis had no basis to enter Ms. Ciaccio's home and grab her, a jury could also determine that any force he used during those moments was excessive. Thus, Officer Carvounis is not entitled to summary judgment on Ms. Ciaccio's unlawful seizure or excessive force claims.[6]

### c.    Securing Ms. Ciaccio's person and premises

Because the Fourth Amendment prohibits unreasonable seizures, citizens have a "right to be free from the use of excessive force." *Anglemeyer v. Ammons*, 92 F.4th 184, 188 (3d Cir. 2024). For an excessive force claim, the question "is whether, under the totality of the circumstances, 'the officers' actions are objectively reasonable in light of the facts and circumstances confronting them[.]'" *Id.* (quotation omitted). In assessing whether

---

[6]    Even if it were undisputed that exigent circumstances existed, Officer Carvounis would still not be entitled to summary judgment on this aspect of Ms. Ciaccio's Fourth Amendment claim because a jury could conclude that Officer Carvounis's act of covering her Ring camera was unreasonable and created the alleged exigency. *See Coles*, 437 F.3d at 366. This is particularly true because the officers were at Ms. Ciaccio's house for a wellness check, rather than a criminal matter, so there was less need to cover any cameras.

officers acted reasonably, courts consider various factors including: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, ... whether he is actively resisting arrest or attempting to evade arrest by flight[,] ... the physical injury to the plaintiff, the possibility that the persons subject to the police action are themselves violent or dangerous, the duration of the action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time." *Anglemeyer*, 92 F.4th at 188-89.

At oral argument, Ms. Ciaccio's Counsel conceded that once Officer Carvounis grabbed Ms. Ciaccio and removed her from her home, the other officers were "justified" in helping him secure her. (Tr. at 26:21 – 27:5.) Counsel also acknowledged that it was reasonable for officers to conduct a security sweep of Ms. Ciaccio's home at that point, stating that "[t]hey were clearly entitled to see if anybody was in the house that might come to their harm." (Tr. at 27:11-14.) Thus, Ms. Ciaccio cannot proceed with excessive force claims against Officer Della Sala, Det. McLaughlin, and Lt. Fritts. Nor can she prevail on an unlawful entry claim based upon the protective sweep of her home.

### d.    Continuing to detain Ms. Ciaccio

Lt. Fritts and Det. McLaughlin have not demonstrated that they had any basis to remain in Ms. Ciaccio's home after they determined that she was unharmed. Once the

protective sweep was over, and it was clear that Ms. Ciaccio was not injured, Det. McLaughlin and Lt. Fritts offer no justification for their continued presence in her home.

They concede that she "was indeed detained when the Defendant Officers engaged her during her mental health crisis." (ECF No. 49-2 at 26.) Det. McLaughlin also admitted that she was not free to leave her apartment while the officers were there speaking with her. There is also evidence that Ms. Ciaccio submitted to Lt. Fritts's and Det. McLaughlin's show of authority. She did not attempt to leave her home or otherwise attempt to remove the officers from her home during this time. Thus, a jury could conclude that a seizure occurred, so the question becomes whether that seizure was reasonable.

Neither Lt. Fritts nor Det. McLaughlin has demonstrated that exigent circumstances existed to excuse the lack of a warrant. The bodycam footage makes clear that Ms. Ciaccio was not in need of emergency aid or assistance. Thus, Lt. Fritts and Det. McLaughlin have failed to demonstrate that their continued seizure of Ms. Ciaccio was reasonable, and they are not entitled to summary judgment on that claim. It does not matter whether the crisis worker *later* told officers that either she or Ms. Ciaccio's father was going to apply for a 302 petition because a jury could determine that the officers had effected an unreasonable seizure by that point. Indeed, the seizure began before Ms. Mendoza-Perez arrived.

To the extent Defendants contend that new information or intervening events created a renewed concern for Ms. Ciaccio's wellbeing, those events might narrow or limit

the scope of the unlawful seizure, but they do not extinguish Ms. Ciaccio's claim altogether. "The initial legality of a seizure turns on the facts and circumstances known to the police at the time of the seizure rather than on facts and circumstances subsequently discovered." *United States v. Shrum*, 908 F.3d 1219, 1232 (10th Cir. 2018). "An unreasonable warrantless seizure of one's home, that is, a seizure unsupported by probable cause and exigent circumstances at the outset, does not become reasonable based on after-the-fact rationales." *Id.* at 1232-33. Thus, a jury will determine the full scope of this alleged seizure.

### e.    Taking Ms. Ciaccio to the hospital

Ms. Ciaccio has sufficient evidence to support her claim that Det. McLaughlin unlawfully seized her when he took her to the hospital for a mental health evaluation. There is no dispute that this was a seizure. However, a warrantless search or seizure does not violate the Fourth Amendment if officers obtained consent. *See United States v. Murray*, 821 F.3d 386, 391 (3d Cir. 2016). "[W]here the validity of a search [or seizure] rests on consent, the State has the burden of proving that the necessary consent was obtained and that it was freely and voluntarily given, a burden that is not satisfied by showing a mere submission to a claim of lawful authority." *Fla. v. Royer*, 460 U.S. 491, 497 (1983). In other words, the fact that Ms. Ciaccio went with Det. McLaughlin without physically kicking and screaming is not sufficient evidence to establish her consent.

Even if Det. McLaughlin had demonstrated that Ms. Ciaccio consented to go to the hospital with him, she has offered enough evidence to create a question as to whether that consent was free and voluntary. Construing the facts in a light most favorable to Ms. Ciaccio, the video evidence reveals that she did not want to go to the hospital. While speaking with Lt. Fritts, Det. McLaughlin, and Ms. Mendoza-Perez, Ms. Ciaccio was visibly distressed and expressed her dismay at the situation. Even Defendants concede that Ms. Ciaccio "expressed her desire not to go, as evidenced by her statements" in the bodycam footage. (ECF No. 47 at Resp. to ¶ 72.) Thus, at the very least, there is a question as to whether Ms. Ciaccio gave free and voluntary consent to go to the hospital.

### f.    Confiscating Ms. Ciaccio's gun

"A 'seizure' of property ... occurs when 'there is some meaningful interference with an individual's possessory interests in that property.'" *Soldal v. Cook Cnty., Ill.*, 506 U.S. 56, 61 (1992) (quotation omitted). Like any other Fourth Amendment claim, determining whether a seizure of property violates the Constitution depends on whether that seizure was reasonable. *See id.* at 71. That inquiry involves a "careful balancing of governmental and private interests." *Id.* (quotation omitted). In this instance, Ms. Ciaccio's Counsel conceded during oral argument that "it's understandable that Detective McLaughlin secured the gun while the police were there." (Tr. at 4:18-19.) Thus, the question is whether it was reasonable for Det. McLaughlin to remove Ms. Ciaccio's gun from her home and retain it for nine days. Because Det. McLaughlin did not have a warrant, his seizure of Ms. Ciaccio's gun is

presumptively unreasonable unless an exception to the warrant requirement applies. Det. McLaughlin has not demonstrated that any recognized exception authorized him to remove Ms. Ciaccio's gun from her home.

*First*, there is no evidence that Ms. Ciaccio consented to Det. McLaughlin removing her gun from her house and keeping it for nine days. At most, the evidence in the record reveals that Ms. Ciaccio told officers that she owned a gun and where they could find it. Nothing about that interaction suggests that Ms. Ciaccio agreed to have an officer take her gun from her home. Thus, Det. McLaughlin's reliance on the *Bane* case is of little use to him, as the plaintiff in that case "agreed to surrender" his gun and also signed a consent form. *Bane v. City of Philadelphia*, No. 09-cv-2798, 2009 WL 6614992, at *9 (E.D. Pa. June 18, 2010). No similar facts establish that Ms. Ciaccio gave consent.

*Second*, there is no evidence in the record of exigent circumstances at the time Ms. Ciaccio left her home to go to the hospital. Det. McLaughlin did not even bother to explain what the alleged exigent circumstances were. Despite his invocations of "safekeeping" (Tr. at 44:12), Det. McLaughlin has not pointed to any controlling cases that recognize a safekeeping exception, and I could not find one. Nor did he show that the undisputed facts establish that some public safety justification applies. At most, he argues that "other people could have access to the house." (Tr. at 44:18-19.) But there is no evidence in the record that there was a unique risk that someone would enter Ms. Ciaccio's home, take her gun, and use it in a dangerous way. Anyone who legally owns a gun can leave it in her home, and someone

else with a key might enter the house. That possibility doesn't give the police a basis to seize the weapon.

*Third*, Counsel suggested that Det. McLaughlin removed Ms. Ciaccio's gun from her home to ensure officers' safety, but that makes no sense. There was no need to ensure the officers' safety when Det. McLaughlin took Ms. Ciaccio to the hospital. The remaining officers had left her home, and even if an officer went into the house, no one was there to use the gun. Because he has not shown that the undisputed facts demonstrate that a recognized exception to the warrant requirement applies, Det. McLaughlin's warrantless seizure of Ms. Ciaccio's gun was presumptively unreasonable, and he is not entitled to summary judgment on this aspect of Ms. Ciaccio's claim.

### 2.    Qualified Immunity

Qualified immunity shields police officers from liability for civil damages as long as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015). To determine whether an officer is entitled to the affirmative defense of qualified immunity for a Section 1983 claim, a court must determine (a) whether the officer violated a constitutional right and, if so, (b) whether the right was clearly established at the time of the officer's conduct. *See Bland v. City of Newark*, 900 F.3d 77, 83 (3d Cir. 2018). "Though the burden of asserting a qualified immunity defense is on the law enforcement officer," the plaintiff must demonstrate a violation of clearly established statutory or constitutional

rights of which a reasonable person would have known. *Rivera-Guadalupe v. City of Harrisburg*, 124 F.4th 295, 299 (3d Cir. 2024) (quotation omitted).

Genuine issues of material fact exist regarding whether Officer Carvounis's, Lt. Fritts's, and Det. McLaughlin's seizures of her and her gun were reasonable. Thus, after construing the facts in the light most favorable to Ms. Ciaccio, I conclude that she has established that these three officers violated her Fourth Amendment rights.

In determining whether those rights were clearly established at the time of the challenged conduct, I must not "define clearly established law at a high level of generality." *Sauers v. Borough of Nesquehoning*, 905 F.3d 711, 716 (3d Cir. 2018) (quoting *Kisela v. Hughes*, 584 U.S. 100, 104 (2018)). There doesn't have to be a case "directly on point for a right to be clearly established," but "existing precedent must have placed the statutory or constitutional question beyond debate." *White v. Pauly*, 580 U.S. 73, 79 (2017) (quotations omitted). In other words, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Id.* (same).

When Officer Carvounis, Lt. Fritts, and Det. McLaughlin entered Ms. Ciaccio's home and seized her, the case law clearly established that they could not do so without a warrant, without her consent, or absent exigent circumstances. Indeed, as early as 2010, the Third Circuit made clear that "[t]he community caretaking doctrine cannot be used to justify warrantless searches of a home" absent "the carefully crafted and well-recognized exceptions" to the warrant requirement. *Ray v. Twp. of Warren*, 626 F.3d 170, 177 (3d Cir.

2010). Then, in May 2021, the Supreme Court solidified this holding and held that officers could not rely on a "community caretaking" justification to enter an individual's home and remove him and his guns—all without a warrant—because they feared he might pose a risk to himself or others. *See Caniglia v. Strom*, 593 U.S. 194, 198 (2021). Thus, when Officer Carvounis, Lt. Fritts, and Det. McLaughlin took nearly identical actions at Ms. Ciaccio's home on February 8, 2023, it was clearly established as a matter of Third Circuit and Supreme Court precedent that the Fourth Amendment prohibited such conduct.

Defendants make much of Justice Kavanaugh's concurrence in *Caniglia*, in which he opines that pursuant to the emergency aid exception, "of course" officers could make a warrantless entry of a home to assist a woman who calls 911 and "says that she is contemplating suicide, that she has firearms in her home, and that she might as well die." *Caniglia*, 593 U.S. at 207 (Kavanaugh, J., concurring). But the facts that might make that warrantless entry reasonable are not present in this case. Instead, this case appears to be on all-fours with *Caniglia*. In *Caniglia*, a third party called 911 fearing that a loved one might be suicidal, but after making contact with the individual and confirming that he was not injured or suicidal, officers nevertheless entered his home and removed him and his guns. Given the factual similarity to this case, a reasonable officer would have known that such conduct violated clearly established law.[7] Thus, Officer Carvounis, Lt. Fritts, and Det.

---

[7]    Indeed, though his subjective intent is not controlling, Lt. Fritts *did* know that the officers "didn't have any right to enter the home." (ECF No. 50-15 at 29:29.)

McLaughlin are not entitled to qualified immunity on Ms. Ciaccio's Fourth Amendment claims.

### B.    Second Amendment Claim

Det. McLaughlin's grounds his arguments as to Ms. Ciaccio's Second Amendment claim in whether his actions were reasonable. While reasonableness is the touchstone of a Fourth Amendment inquiry, it does not bear on Ms. Ciaccio's Second Amendment claim.

The Second Amendment ensures "the right of the people to keep and bear Arms[.]" U.S. Const. amend. II. "[U]nless an exception applies, the Second Amendment protects a person's right to keep [her] lawfully owned guns." *Frein v. Pennsylvania State Police*, 47 F.4th 247, 253 (3d Cir. 2022). Det. McLaughlin has not demonstrated that any exception applied.[8] In a case like this—where the undisputed facts show that there was no warrant and no authorized seizure under an applicable exception—Det. McLaughlin could not take Ms. Ciaccio's gun and keep it for an indefinite period. *See id.* at 254. Thus, he has not shown that he is entitled to summary judgment on Ms. Ciaccio's Second Amendment claim, and he is not entitled to qualified immunity on this claim for the same reason he cannot invoke qualified immunity in light of *Caniglia*.

---

[8]    Given the record before me, it is unlikely that any other exception would apply, as Det. McLaughlin did not seize Ms. Ciaccio's gun because she was convicted of a crime or because she may have used the gun to commit a crime. *See Frein*, 47 F.4th at 256.

### C.    *Monell* **Claim**

"[A] § 1983 claim against a municipality may proceed in two ways. A plaintiff may put forth that an unconstitutional policy or custom of the municipality led to his … injuries, or that they were caused by a failure or inadequacy by the municipality that 'reflects a deliberate or conscious choice[.]'" *Forrest v. Parry*, 930 F.3d 93, 105 (3d Cir. 2019) (citations and quotations omitted). Ms. Ciaccio has not demonstrated that she could prevail on either type of *Monell* claim.

While Ms. Ciaccio contends that the officers on site were acting "pursuant to an official policy of the Township and the Borough pertaining to 'Persons with Special Needs'" and that such policy "did not conform to the strictures of the Fourth Amendment" (ECF No. 51 at 22), she does not offer any evidence or argument to support those assertions. She doesn't identify which provision(s) of the Township's policy she contends are problematic, and it is not my job to make those arguments for her. Thus, without any additional information, I cannot conclude that a jury could determine that Defendants were acting pursuant to this policy or that doing so violated the Fourth Amendment. In addition, there is no evidence in the record that the Borough adopted this policy, so even if a jury could determine that it was unconstitutional, that would not be a basis to impose *Monell* liability upon the Borough.

Ms. Ciaccio's alternate theories of *Monell* liability also fail because they both hinge on a finding that Lt. Fritts was an official policymaker.[9] Ms. Ciaccio offers no evidence or explanation as to how Lt. Fritts could be an official policymaker for the Borough, so her *Monell* claim against the Borough fails for that reason. Whether Lt. Fritts is an official policymaker for the Township is a question of state law. *See B.S. v. Somerset Cnty.*, 704 F.3d 250, 275 n.36 (3d Cir. 2013). In other words, that determination does not turn on whether Lt. Fritts physically drafted the Township Police Department's operating procedures or whether his decisions on the scene were "effectively unreviewable." (ECF No. 51 at 24.) Instead, "as a matter of Pennsylvania state law, a township Police Chief is not a final policymaker." *Santiago v. Warminster Twp.*, 629 F.3d 121, 135 n.11 (3d Cir. 2010). It follows, then, that a Lieutenant is not a final policymaker, either. Rather, Pennsylvania law vests authority over the "organization and supervision" of township police officers with the township board of supervisors. 53 Pa. Stat. Ann. § 66902. Thus, because Ms. Ciaccio cannot establish that Lt. Fritts was a policymaker for the Township, she cannot prevail on her *Monell* claim against it.

---

[9]     Ms. Ciaccio contends that the Township was deliberately indifferent because Lt. Fritts knew that officers had no legal basis to enter Ms. Ciaccio's home and detain her, yet he did so. She also contends that Lt. Fritts' decision to continue detaining Ms. Ciaccio after determining that she was not hurt "was an 'official policy' because it was for all practical purposes the final and unreviewable decision on the matter." (ECF No. 51 at 23.)

**D.      State Law Claims[10]**

**1.      Assault and battery**

In Pennsylvania, "[a]ssault is an intentional attempt by force to do an injury to the person of another, and a battery is committed whenever the violence menaced in an assault is actually done, though in ever so small a degree, upon the person." *Renk v. City of Pittsburgh*, 641 A.2d 289, 293 (Pa. 1994) (quotation omitted). But police officers "may use reasonable force to prevent interference with the exercise of [their] authority or the performance of [their] dut[ies]." *Id.* "The reasonableness of the force used ... determines whether [a] police officer's conduct constitutes an assault and battery." *Id.* Because I have concluded that a jury could find that Officer Carvounis used excessive force against Ms. Ciaccio, he is not entitled to summary judgment on her claims for assault and battery. However, Ms. Ciaccio cannot proceed with her excessive force claims against Officer Della Sala, Lt. Fritts, and Det. McLaughlin. Thus, she cannot maintain her claims for assault and battery against them either.

**2.      False arrest and imprisonment**

Under Pennsylvania law, false arrest and false imprisonment "are identical theories of liability" that require "(1) the detention of another person (2) that is unlawful." *Braswell*

---

[10]      There is no argument before me about Chief Nicoletti's liability for the state law claims. I therefore will not grant summary judgment in favor of Chief Nicoletti because it is not my job to make arguments for him, though I do have some doubt about Ms. Ciaccio's ability to prevail against Chief Nicoletti on these claims.

*v. Wollard*, 243 A.3d 973, 979 (Pa. Super. Ct. 2020) (quotations omitted). Defendants concede that officers detained Ms. Ciaccio when they "engaged her during her mental health crisis." (ECF No. 49-2 at 26.) Thus, because I have determined that a jury could conclude that Officer Carvounis's, Lt. Fritts's, and Det. McLaughlin's detentions of Ms. Ciaccio were unlawful, they are not entitled to summary judgment on her claims of false arrest and imprisonment.

### 3.    Intentional infliction of emotional distress

To sustain an IIED claim under Pennsylvania law, the plaintiff must prove "'intentional outrageous or extreme conduct by the defendant, which causes ***severe emotional distress*** to the plaintiff' and 'some type of resulting physical harm due to the defendant's conduct.'" *Davis v. Wigen*, 82 F.4th 204, 216 (3d Cir. 2023) (quoting *Swisher v. Pitz*, 868 A.2d 1228, 1230 (Pa. Super. Ct. 2005)) (emphasis added). Ms. Ciaccio has not pointed to any evidence in the record that could lead a jury to conclude that she has suffered from ***severe*** emotional distress due to Defendants' conduct. To the extent Ms. Ciaccio made such allegations in her Second Amended Complaint, those allegations are not evidence and, as such, are insufficient to overcome summary judgment. *See Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1362–63 (3d Cir. 1992). Thus, she cannot prevail on her IIED claim, and Defendants are entitled to summary judgment.

### E.    Punitive Damages

Plaintiffs may recover punitive damages in a Section 1983 suit "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983). However, municipalities are "immune from punitive damages under 42 U.S.C. § 1983." *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981). Because I am granting summary judgment in favor of both municipal defendants in this case—the Township and the Borough—there is no need for me to strike any punitive damages request as to them. In addition, because Ms. Ciaccio's remaining claims are against Officer Carvounis, Lt. Fritts, and Det. McLaughlin in their individual capacities (as opposed to their official capacities), she may proceed with her request for punitive damages against them at trial.[11] Whether their conduct warrants such an award is for a jury to decide.

## IV.    CONCLUSION

There is enough evidence in the record that could lead a jury to conclude that Officer Carvounis, Det. McLaughlin, and Lt. Fritts seized Ms. Ciaccio and that those seizures were unreasonable, in violation of the Fourth Amendment. There is also enough evidence that Det. McLaughlin violated Ms. Ciaccio's Second and Fourth Amendment rights when he took her gun from her home and did not return it to her for nine days. And because the law prohibiting this conduct was clearly established at the time, none of these

---

[11]    Counsel for Defendants conceded this point during oral argument.

Defendants is entitled to qualified immunity. Thus, I will deny the Defendants' motion for summary judgment as to those claims, but I will grant summary judgment on Ms. Ciaccio's claims against Officer Della Sala, as there is no similar evidence in the record that he unreasonably seized her or her gun. In addition, Ms. Ciaccio cannot maintain her *Monell* claims against the Township and the Borough because she cannot demonstrate that Lt. Fritts was a policymaker who could subject those entities to municipal liability. An appropriate Order follows.

**BY THE COURT:**

*/s/ Joshua D. Wolson*
JOSHUA D. WOLSON, J.

May 1, 2025